IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CENTRAL ELECTRIC COOPERATIVE,          Civil No. Civ. 05-6017-AA
an Oregon cooperative,                        OPINION AND ORDER

            Plaintiff,

      vs.

U.S. WEST, INC.,
a Delaware Corporation,

            Defendant.
————————————————————

Martin E. Hanson
Michael H. McGean
Francis Hansen & Martin LLP
1148 NW Hill Street
Bend, OR 97701
      Attorneys for Plaintiff

Michael H. Simon
Lawrence H. Reichman
Amber A. Hollister
Perkins Coie LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
      Attorneys for Defendant

AIKEN, Judge:

Defendant filed a motion for summary judgment asserting it is entitled to judgment on plaintiff's claims alleging violation of Oregon statutes and administrative rules.  The court heard telephone oral argument on December 3, 2007.  Defendant's motion is granted.

BACKGROUND

Plaintiff, Central Electric Cooperative ("CEC"), filed suit against defendant U.S. West, Inc., now properly known as Qwest Corporation ("Qwest").  Qwest's predecessor Pacific Telephone and Telegraph, entered into a joint pole use agreement with CEC in 1949.  In 1999, CEC sued Qwest for breach of the 1949 agreement. The parties settled that lawsuit by entering a Settlement and Joint Use Agreement effective December 22, 2000.  Plaintiff's Affidavit of Al Gonzales, Exhibit 1, Settlement Agreement.

Qwest paid CEC the rental rate for all authorized attachments to CEC poles for calendar years 2001 and 2002.  On or about September 14, 2004, Qwest paid CEC for attachments to 13,673 poles for 2003 at the rate of $11.48 per attachment, for a total payment of $156,966.04.  The settlement agreement was scheduled to terminate on January 1, 2004.  On June 7, 2004, an audit as agreed to by the settlement agreement revealed an additional 627 poles, whose attachments were made prior to January 1, 2004, and were not covered by permit.  CEC demanded

payment from Qwest in the form of sanctions for those 627 attachments in accord with the terms of the settlement agreement. That amount totaled $71,979.60 for 2003.

On July 20, 2004, CEC sent a new Standard Joint Use Agreement to Qwest, proposed to take effect January 1, 2005. In the accompanying correspondence indicated that it planned to implement the agreement on January 1, 2005. On November 4, 2004, CEC requested that Qwest pay the same penalty amount for 2002 as Qwest paid for 2003 for the 627 unauthorized attachments. On or about November 16, 2004, Qwest paid $143,959.20 representing the penalties on the unauthorized poles. By mid-November, Qwest obtained permits for the 627 previously unauthorized attachments. On November 30, 2004, CEC informed Qwest that the pole attachments during 2004 violated O.A.R. 860-028-0170 and penalties calculated by the then-existing Public Utility Commission ("PUC") Regulations were due. On December 15, 2004, Qwest contacted CEC disputing its liability under O.A.R. 860-028-0170 and submitted a plan for correction in case the O.A.R. did apply. On or about January 17, 2005, Qwest sent a check to CEC in the amount of $164,531.36. Qwest alleges that this money was sent for payment for the attachments for 2004, however CEC disputes this fact. CEC did not deposit this check. In August 2005, CEC and Qwest reached agreement on the terms of a new joint use agreement that was expressly stated to be effective January

Page 3 - OPINION AND ORDER

28, 2005.

On or about December 24, 2004, plaintiff commenced a civil suit against defendant alleging: (1) Qwest had attachments to 14,352 poles without a contract in place and is therefore liable for maximum penalties on those poles amounting to $19,771,315.00 plus statutory interest; and (2) Qwest had attachments to 627 poles without contracts (or in the alternative without permits) and is therefore liable for the maximum penalties on those poles amounting to $863,755.20 plus statutory interest.

STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Substantive law on an issue determines the materiality of a fact. T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of a dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett,

Page 4 - OPINION AND ORDER

477 U.S. 317, 323 (1986).  If the moving party shows the absence
of a genuine issue of material fact, the nonmoving party must go
beyond the pleadings and identify facts which show a genuine
issue for trial.  Id. at 324.

Special rules of construction apply when evaluating summary
judgment motions: (1) all reasonable doubts as to the existence
of genuine issues of material fact should be resolved against the
moving party; and (2) all inferences to be drawn from the
underlying facts must be viewed in the light most favorable to
the nonmoving party.  T.W. Electrical, 809 F.2d at 630.

DISCUSSION

Regarding plaintiff's first claim, defendant's motion for
summary judgment is granted.

O.R.S. § 757.271 states:

"(1) Subject to applicable regulations of the Public Utility
Commission, a person shall not establish an attachment to a
pole or other facility of a public utility,
telecommunications utility or consumer-owned utility unless
the person has executed a contract and has authorization
from the utility allowing the attachment.  (2)  A licensee
shall report all pole attachments to the pole owner.  A pole
owner may impose on a licensee a penalty charge for failing
to report an attachment.  The pole owner also may charge the
licensee for any expenses incurred as a result of an
unauthorized attachment or any attachment that exceeds
safety limits established by rule of the commission."

Plaintiff alleges that when the contract terminated on January 1,
2004, all 14,352 attachments were in violation of the statute and
corresponding Oregon Administrative Rules, by being attached with

no existing contract in place.

Defendant argues that plaintiff's first claim fails for several reasons: (1) there was a valid contract in place when the pole attachments were made; (2) the settlement agreement specifically provides that attachments existing January 1, 2004, would not be subject to PUC's penalty rules; (3) CEC failed to provide notice; (4) the settlement agreement did not terminate because a condition precedent did not occur; and (5) even if the settlement agreement did terminate, it included several provisions that survived and continued to govern the parties' relationship after termination, which themselves constitute a written master contract under PUC's rules.

The court will address the issue of notice first. Oregon Administrative Rule 860-028-0190[1], titled "Notice of Violation," stated: "A pole owner that seeks, under these rules, any type of relief against a pole occupant for violation of O.A.R. 860-028-0120[2] *shall provide the pole occupant notice of each attachment allegedly in violation of the rule, including the provision of the rule each attachment allegedly violates*." (emphasis added).

Oregon Administrative Rule 860-028-0130 governs the

---

[1]This O.A.R. has since been amended, however, the court relies upon the rule in place at the time of the alleged violation.

[2]This O.A.R. section sets forth the duties of pole occupants.

Page 6 - OPINION AND ORDER

sanctions applicable for having no contract when an attachment is established. The Rule provides for a reduction in sanctions if the pole occupant complies within 60 days of receipt of notice or within 30 days of receipt of notice if the pole occupant submits a plan of correction. O.A.R. 860-028-0130, O.A.R. 860-028-0170.

Plaintiff argues that Qwest misinterprets the "Notice of Violation" regulation. Plaintiff asserts the provision does not contain any advance notice or actual notice requirements for the pole owner. Plaintiff further argues the rule simply reflects the scheme of the PUC's penalty regulations, which allows the pole owner to assess the penalties itself and then to bill the pole occupants for those penalties.

Based on this interpretation of the rule, plaintiff states that CEC has fully complied with the regulation relying on its letters dated June 4, 2004; July 20, 2004; and November 30, 2004. Alternatively, plaintiff argues there was definitive notice provided by plaintiff's complaint.

I find the "Notice of Violation" regulation does require actual advance notice to the pole occupant. The scheme in which penalties are reduced for compliance or submission of a plan to comply would not be meaningful or enforceable unless actual notice is given. The court examined the letters which allegedly supplied notice to the defendant and found the letters specifically addressed the 627 unauthorized contacts, not the

14,352 contacts that are alleged in plaintiff's first claim.
There was no mention of the penalties being applicable to all the
existing poles in plaintiff's three letters or elsewhere until
the complaint was filed.  The rules set forth a scheme which
allows a pole occupant to minimize its sanctions through
correction of the violation.  Clearly, actual notice as to the
possibility of a sanction (nearing $20 million in this case)
requires the pole occupant be put on notice and that notice
should come before alleging the maximum damages in a complaint.

Plaintiff failed to supply the defendant with the requisite
notice for its first claim.  Therefore, defendant's motion for
summary judgment is granted on that claim.

Plaintiff's second claim, while not articulated clearly,
appears to be that the 627 unauthorized attachments are subject
to the "no contract" penalties set forth by the PUC's guidelines
under a theory similar to its first claim; or in the alternative,
the 627 unauthorized poles are subject to "no permit" penalties
to be calculated by the PUC's regulations.

Defendant argues plaintiff's second claim fails because (1)
all the pole attachments were made prior to January 1, 2004, when
Qwest had a contract with CEC and the no contract penalties are
only applicable when attachments are initially attached; (2) CEC
failed to provide notice; (3) the contract did not terminate
because a condition precedent was not met; and (4) if the

contract did terminate, the parties had a written agreement that provided the general terms for attachments at all relevant times.

The relevant section of the settlement agreement states:

10.  The parties agree to exercise good faith in negotiating a joint use agreement to cover that period beginning January 1, 2004.  If no agreement can be reached prior to January 1, 2004, despite the good faith of both parties, then this Agreement will terminate and any future joint use of the parties' poles will continue without a contract solely pursuant to the PUC's then-existing regulations.  It is understood by both parties that their good faith performance of the terms of settlement will likely be a factor in the negotiation of any future agreement beginning January 1, 2004.  It is further understood by both parties that if no agreement has been reached by January 1, 2004, then:
  (1)  all attachments that have been made consistent with this Agreement prior to that date may be kept in place provided that the appropriate rental rate (as determined under PUC's then-existing regulations without reference to penalties) continues to be timely paid and there shall be no penalties owed for any such attachments;
  (2) any penalties for attachments not authorized prior to the date shall be determined by the PUC's then-existing regulations; and
  (3) no new attachments may be made after January 1, 2004, except as may be permitted by the PUC's then-existing regulations or agreements by both parties.

Plaintiff's Affidavit of Al Gonzales, Exhibit 1, Settlement Agreement pg. 4.

Defendant argues that the settlement agreement condition that the parties negotiated in good faith never occurred and therefore the contract never terminated. I disagree and find the contract did in fact terminate on January 1, 2004.  In determining whether an "agreement to negotiate" is too indefinite to be enforced, the court must analyze the substance of the

Page 9 - OPINION AND ORDER

parties' promises.  Logan v. D.W. Sivers Co., 2007 WL 3026370, *4
(D. Or. October 18, 2007).  It is the content of the agreement
that is important.  Id.  Logan found that the agreement contained
an exchange of promises that each party intended to be binding
and that were sufficiently definite to allow a jury or court to
determine what is required of each party.  Id.  Specifically, the
agreement in Logan stated what each party was expected to do so
the court could clearly determine if one party or the other
failed to comply.  Id.  In the settlement agreement before this
court, it is ambiguous as to which party would be responsible for
drafting the new contract or for initiating the negotiation.
Without this specificity, the agreement to negotiate in good
faith cannot be treated as an enforceable condition precedent to
the contract terminating.

      The court, however agrees with defendant that although the
contract terminated there remained general terms set forth in the
settlement agreement that governed until the new contract was put
in place, specifically sections 10 (1)-(3) of the settlement
agreement.  Defendant, however, argues that section 10(2) applies
to attachments after January 1, 2004.  The court disagrees.  This
reading is not supported by the plain text of the settlement
agreement.  Sections 10(1) and (2) set out how attachments that
are already in place will be treated after termination of the
settlement agreement.  Section 10(1) covers attachments made

consistent with the agreement and section 10(2) covers attachments
that were unauthorized prior to January 1, 2004.   Section 10(2)
cannot apply to attachments after January 1, 2004, because
section 10(3) specifically states that there will be no such
attachments except as agreed upon by the parties.   Section 10(2)
requires the PUC then-existing regulations to be applied to the
627 unauthorized attachments.

The court must now analyze the PUC regulation requiring
interpretation of the statute or regulation as the Oregon Supreme
Court would interpret the statute or regulation.   <u>Nike, Inc. v.
McCarthy</u>, 379 F.3d 576, 581 (9th Cir. 2004).   The analysis begins
with the text and context of the statute or regulation in
question.   <u>PGE v. Bureau of Labor & Indus.</u>, 317 Or. 606, 610, 859
P.2d 1142 (1993).   If the meaning of a statute or regulation is
clear on its face, the inquiry ends.   <u>Id.</u>

Defendant argues that the use of the word "establish" in
O.R.S. § 757.271[3], and the use of the word "attaching" in O.A.R.
860-028-0120[4], should be interpreted to indicate the requirement
for a contract is applicable when the attachment is initially
made.   I agree.   Defendant relied analysis of the words by an
expert in English grammar, discourse analysis and the use of

---

[3]O.R.S. 757.271 states:   "...a person shall not *establish*
an attachment to a pole..."   (emphasis added).

[4]O.A.R. 860-028-0120 stated:   "...a pole occupant *attaching*
to one or more poles of a pole owner shall..."   (emphasis added).

Page 11 - OPINION AND ORDER

computer-assisted techniques for vocabulary and grammar analysis. The expert's analysis of the words used in the statute and the regulation support defendant's argument as its interpretation. That is, the words "establish" and "attaching" should be interpreted to indicate the requirement for a contract is applicable when the attachment is initially made.

Further, and perhaps more importantly, the plain reading of the text, in the context of other regulations, does not give any indication that after the attachment is established or attached that sanctions are appropriate. Nor does the statute or the Oregon administrative rules give the pole owner any right to charge the pole occupant repeatedly.[5]  Conversely, the settlement agreement clearly indicated that while the settlement agreement was effective, sanctions were to be imposed "for each year of unauthorized use."  Absent similar language in the statute or regulation, this court finds no support to uphold such an interpretation.

Because the PUC's then-existing regulation does not provide for repeated imposition of sanctions, CEC may not seek additional sanctions.  Defendant's motion for summary judgment as to

---

[5]O.A.R. 860-028-0130 has been amended to state: "Sanctions imposed pursuant to this rule will be imposed no more than once in a 365 day period."  O.A.R. 860-028-0140 has been amended to state: "Sanctions imposed pursuant to this rule will be imposed no more than once in a 60 day period."  While these changes may change the interpretation of the regulation at issue, this language was not in effect when the alleged violation occurred.

Page 12 - OPINION AND ORDER

plaintiff's second claim is granted.

CONCLUSION

Defendant's motion for summary judgment (doc. 34) is granted.  Defendant's motion to strike (doc. 59) is denied.  This case is dismissed.

IT IS SO ORDERED.

Dated this _4_ day of December 2007.


_____
Ann Aiken
United States District Judge